## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANTONIO TAVARES,                      :        1:13-cv-1313
on behalf of himself and similarly    :
situated employees,                   :
                                      :
        Plaintiffs,                   :        Hon. John E. Jones III
                                      :
    v.                                :
                                      :
S-L DISTRIBUTION CO., INC., and       :
S-L ROUTES, LLC,                      :
                                      :
        Defendants.                   :

### MEMORANDUM

### May 2, 2016

The Court is in receipt of Plaintiffs' unopposed Motion for Final Approval of the Class Action Settlement, filed April 13, 2016. (Doc. 122). A fairness hearing was held in this matter on April 20, 2016. Based on the submissions of the parties and the testimony at the hearing, and for the reasons that follow, the Motion shall be granted.

## I.    FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs in the above-captioned matter are delivery drivers employed by the Defendants,[1] who reside in Massachusetts and make deliveries to stores in

---

[1]  In the fairness hearing on April 20, 2016, Defendants noted that they contest this characterization of Plaintiffs, whom they view solely as independent contractors. (Transcript, Doc. 129, p. 12).

Massachusetts.  Defendants are a Delaware corporation with its principal place of business in Pennsylvania, as well as its wholly-owned subsidiary, a Pennsylvania limited-liability company.  They are in the business of selling snack food products to retail stores, and maintain several warehouses in Massachusetts for the purpose of distributing certain brands of snack foods.

Defendants entered into written Distributor Agreements with each Plaintiff, pursuant to which Plaintiffs were classified as independent contractors.  The Agreements also provided that "any disputes or claims which arise between the parties shall be governed by, subject to, and construed in accordance with, the laws of the Commonwealth of Pennsylvania without giving effect to its conflicts of law or choice of law provisions."  (Doc. 17-1, p. 21).

Plaintiffs commenced this action by filing a Class Action Complaint (Doc. 1-3, pp. 4-11), and later an Amended Class Action Complaint (Doc. 1-3, pp. 13-21), in the Massachusetts Superior Court.  Plaintiffs' claims arise from their central contention that, under the Massachusetts Wage Act, they should be correctly characterized as employees of Defendants and not independent contractors.  The matter was subsequently removed to federal court and then transferred to this Court.  After Defendants filed an Answer (Doc. 44), Plaintiffs moved for partial summary judgment, seeking a declaration that Massachusetts law applies to their

claims that they were wrongly classified as independent contractors.  (Doc. 46).[1]

Following a full briefing, this Court issued a Memorandum and Order on January

14, 2014, granting Plaintiffs' Motion.  (Doc. 70).  However, in their brief in

support of the instant Motion, Plaintiffs note that "S-L disputes that Massachusetts

Law, including the Wage Act, properly applies to these claims.  Rater, S-L asserts

that Pennsylvania law applies, as expressly provided in the Distributor

Agreements."  (Doc. 123, p. 3, fn. 6).

---

[1]  Under the Massachusetts Wage Act, an individual performing services for another is considered to be an employee unless the employer proves, by a preponderance of the evidence, that

(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

> (2) the service is performed outside the usual course of the business of the employer; and,

> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

M.G.L. 149 § 148B; *see also Somers v. Converged Access, Inc.*, 911 N.E.2d 739, 747 (Mass. 2009).

In Pennsylvania, courts rely on a common-law test and consider the following factors in determining whether an individual is an employee or an independent contractor:

> Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time.

*Hammermill Paper Co. v. Rust Engineering Co.*, 243 A.2d 365, 370 (Pa. 1968).  In factual scenarios similar to the instant one, the party claiming the master-servant relationship bears the burden of proving it.  *See Johnson v. Angretti*, 73 A.2d 666, 669-70 (Pa. 1950).

Litigation in this matter continued on for over a year, until the Court was informed that a settlement had been reached pursuant to a status report filed by Plaintiffs on September 4, 2015.  (Doc. 114).  An unopposed Motion for Preliminary Approval of the Class Action Settlement and Certification of the Settlement Class (Doc. 120) containing the settlement agreement as an attached exhibit (Doc. 120-1) (the "Agreement") was granted on December 28, 2015.  (Doc. 121).  The Order appointed the law firms of Winebrake & Santillo, LLC and Lichten & Liss-Riordan, P.C. as class counsel.  (*See id*. at ¶ 3).  The Order also approved the notice and claim forms attached to the Agreement as Exhibits B-D and directed the parties to strictly follow their agreed-upon notice and claim protocols.  (*Id*. at ¶ 4).  Following that Order, class counsel sent the approved forms[2] to all the identified class members, thereby affording them an opportunity to participate in, exclude themselves from, or object to the terms of the settlement.  No class members objected to the terms; however, seven class members have elected to exclude themselves from the settlement, including several named representatives of the class.  (Doc. 123, p. 16).

As noted above, on April 13, 2016, Plaintiffs filed an unopposed Motion for Final Approval of the Class Action Settlement, (Doc. 122), as well as a Brief in

---

[2] Two slightly different notice and response forms were sent to the class members depending on whether they are currently engaged in business with the Defendants, or had engaged with them during the relevant claim period but are no longer currently employed.

Support of the Motion, (Doc. 123).  A fairness hearing was held in this matter on

April 20, 2016.  For the following reasons, the Motion shall be granted and the

settlement shall be approved.

## II.   DISCUSSION

### A.    Class Certification

As an initial matter, we note that the decision of certain class members, even

named class representatives, to exclude themselves from the settlement does not

prevent a court from approving a class certification and settlement, so long as the

proposed class meets the requirements established by Rule 23 and the agreement

reached by the parties is fair, adequate and reasonable.  *See Martin v. Foster*

*Wheeler Energy Corp*, Civ. Action No. 3:06-CV-0878, 2007 WL 4437221, at *6

(M.D.Pa., Dec. 14, 2007) (approving a settlement for a class action in which 20 of

the 147 class members excluded themselves); *In re Nat'l Football League Players*

*Concussion Injury Litig.*, --- F.3d ----, 2016 WL 1552205, at *16 (3d Cir. April 18,

2016) (upholding a district court ruling in favor of class action certification and

settlement for over 20,000 class members where 202 members opted out and 95

objected to the settlement terms).

To establish a class action, a case "must satisfy the four requirements of

Rule 23(a) and the requirements of either Rule 23(b)(1), (2) or (3)."  *Marcus v.*

*BMW of North America, LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  The party

seeking the class certification bears the burden of establishing each element of the class certification rule by a preponderance of the evidence.  Actual, and not presumed, conformity with the rule requirements is essential.  *Id*. at 591.

### i.      Rule 23(a)

To satisfy Rule 23 (a),

(1) the class must be "so numerous that joinder of all members is impracticable (numerosity); (2) there must be questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class (typicality); and (4) the named plaintiffs must fairly and adequately protect the interests of the class (adequacy of representation, or simply adequacy).

*Marcus*, 687 F.3d at 590-91 (internal quotations and citations omitted).

In the instant case, Plaintiffs seek final class certification for the class as defined by the parties' Class Action Settlement Agreement and Release, that is:

all individuals who, either individually or through a business entity or entities in which the individual had an ownership interest, sold and distributed snack food products in Massachusetts pursuant to written Distributor Agreements with S-L Distribution Co., Inc. and/or S-L Routes, LLC, or their predecessors, which individuals are listed on Exhibit A of the Agreement.

(Doc. 123, p. 13).

We begin our analysis with a consideration of numerosity.  The class size here encompasses 224 individuals, 178 of which have submitted claims.[3]  (*Id*., p.

---

[3] The thirty-nine members who have not filed claims failed to respond to the notice.  They will receive a second, thirty-day window in which to file a claim after initial settlement checks are issued, as in class counsel's experience, the distribution of settlement checks often causes other

24).  This number exceeds the typical numerosity requirement, usually satisfied when "the potential number of plaintiffs exceeds forty." *Marcus*, 687 F.3d at 595. Thus, the class is sufficiently numerous to warrant certification.

Next we consider the requirement of commonality.  "A putative class satisfies Rule 23(a)'s commonality requirement if 'the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.' *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). . . .  [T]hat bar is not a high one." *Rodriguez*, 726 F.3d at 382.  "[E]ven a single common question will do." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 482 (3d Cir. 2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2556 (2011).  Here, all Plaintiffs, including remaining named Plaintiffs Itto Mosso and Jorge Delgado, allege that they were misclassified as independent contractors and that, pursuant to the Massachusetts Wage Act, they should have been hired by Defendants as employees.  (*See* Doc. 123, p. 25).  Thus, the success of all their claims turns on this Court's interpretation of the Act, and whether certain aspects it, critical to Plaintiffs' success, have been preempted by the Federal Aviation Administration Authorization Act.  Because of this common argument, the cases put forth by the class members and the named representatives share questions of law and fact that determine their ability to receive the requested remedy.  Thus, the commonality requirement is easily met.

---

class members to come forward with claims.  Once this period has passed, a second distribution of the remaining settlement funds will ensue.  (Doc. 123, pp. 16-17).

The third 23(a) requirement is typicality.  "Typicality . . . derives its independent legal significance from its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus*, 687 F.3d at 598.  However, "[i]f the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 259 F.3d 154, 183-84 (3d Cir. 2001).  The briefs and testimony heard at the fairness hearing have not indicated that any class members are situated in a way that is markedly different from the class representatives. Rather, the named plaintiffs and the class members performed materially the same duties and responsibilities, as all were or continue to be delivery drivers employed by Defendants.  (Doc. 123, p. 26).  More importantly, they were all subject to substantially similar Distributor Agreements, and all allege the same injury – that the agreements misclassified them as independent contractors instead of employees.  (*Id*.).  Thus, they were all subject to the same conduct by Defendants, which impacted all the class members in the same way, as they all have the same compensation structure.  Thus, the typicality requirement is also met.

The last 23(a) requirement is adequacy.  The Court must consider whether the class representatives and class counsel will fairly and adequately protect the

interests of the class. To be an adequate representative, "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir. 1975). Defendants have not contested this point (nor have they contested any other) and there appears no reason to find that Plaintiff's interests are antagonistic to those of the potential class; indeed, they are willing to settle this lawsuit under the same terms and conditions as those presented to the other class members.

There is also no reason to find that Plaintiff's counsel is unqualified. Plaintiffs are represented by counsel with considerable experience in employment rights litigation, and counsel has successfully negotiated a large number of suits arising under wage and hour laws in the past.  (*See* Docs. 122-4, 122-5).  Further, though several members of the class have opted to exclude themselves from the settlement, we find it notable that those members have not objected to the settlement and have indeed requested that class counsel continue to represent them in Plaintiffs' ongoing independent litigation.  (Transcript, Doc. 129, pp. 6-7). Thus, there is no reason to find that Plaintiff and Plaintiff's counsel have not adequately represented the class.

### ii.    Rule 23(b)

"If the Rule 23(a) requirements are met, then a court must consider whether the class fits within one of the three categories of class actions set forth in Rule 23(b)." *In Re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 392 (3d Cir. 2015).   In this case, Plaintiff proposes that the class fits within Rule 23(b)(3), a category that requires the Court to determine "whether (1) common questions predominate over any questions affecting only individual class members (predominance) and (2) class resolution is superior to other available methods to decide the controversy (superiority)." *In re Nat'l Football League*, 2016 WL 1552205, at *16 (citing FED. R. CIV. P. 23(b)(3)).   "Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria." *Amchem*, 521 U.S. at 615-16 (citing FED. R. CIV. P. 23(b)(3)).  These include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.*

### a.    Predominance

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).  This

standard is "far more demanding than the commonality requirement of Rule 23(a), requiring more than a common claim." *In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir.2008)* (internal citations omitted).  However, courts are "nonetheless 'more inclined to find the predominance test met in the settlement context." *In re Nat'l Football League*, 2016 WL 1552205, at *21 (quoting *Sullivan v. DB Investments, Inc*., 667 F.3d 272, 304, n. 29 (3d Cir. 2011) (*en banc*)).  The "nature of the evidence ... determines whether the question is common or individual." *In re Hydrogen Peroxide*, 552F.3d at 311 (citing *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir.2005)). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir.2001).  If common issues that determine liability predominate, class certification is appropriate even if damages must still be proven individually.  *See Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985).

In the context of a predominance analysis, we reiterate that the Court's interpretation of the Massachusetts Wage Act, and specifically whether certain aspects of the Act are preempted by the Federal Aviation Administration Authorization Act, predominates over all of Plaintiffs' claims.  The resolution of the preemption issue will be the same in each case, and will impact the rights of every class member in the same way.  Further, the facts of each case are largely

constrained by the Distributor Agreements, which we have already described as substantially similar to one another.  While we note that the damages to be awarded in each Plaintiff's claim would require individual calculation because some Plaintiffs may not have worked as frequently or for as many weeks as others, this disparity does not create cause to defeat class certification.  Importantly, the Agreement provides that all class members' damages awards will be calculated in the same way, and the only differentiating factor will be the number of weeks that each worked.  As the Third Circuit in *Newton*, 259 F.3d at 172, emphasized, a class is prime for certification where the essential elements of each class members' claims are identical and proving them as to one would extend to all.  Here too, we find that the proposed class is sufficiently cohesive such that representation through class action is warranted.  *See Amchem*, 521 U.S. at 623 (noting that predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.").

### b.    Superiority

"Rule 23(b)(3)'s superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available means of adjudication."  *In re Nat'l Football League*, 2016 WL 1552205, at *22 (quoting *In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 534 (3d Cir. 2004)).  Here, the class action prevents the litigation of hundreds of duplicative

lawsuits.  Further, without a class action, individual plaintiffs' damages amounts could be small enough to render separate suits impracticable.  *See Amchem*, 521 U.S. at 616 (noting that any interests of individuals in conducting separate lawsuits "may be theoretic rather than practical" where "the amounts at stake for individuals may be so small that separate suits would be impracticable.").  In light of this reasoning we find that, like the requirements of Rule 23(a), the predominance and superiority requirements pursuant to Rule 23(b)(3) are also met. Class certification is thus appropriate and shall be granted for purposes of effectuating the proposed settlement.

### B.      Fairness of the Class Action Settlement

We move now to consider the terms of the settlement.  In the instant case, the parties have agreed to a $2,850,000 non-reversionary settlement fund, from which attorneys' fees and expenses are to be paid, as well as enhancement awards for the named Plaintiffs and a $5,000 award to Plaintiff Antonio Oliviera.[4]  This results in a net fund of $2,070,000, to be distributed to 178 settlement class members.  The average individual payout will be approximately $11,692, determined based on a ratio of weeks the particular Plaintiff worked compared to

---

[4] The $5,000 award to Plaintiff Antonio Oliveira is to be paid in exchange for releasing the Defendants from claims that were or could have been asserted in his MCAD charge, and/or the cross-filed action in this suit. (*See* Doc. 120-1, ¶ 5(C)).

the total weeks worked by all other claimants during the relevant time period.[5]

Further, because the fund is non-reversionary, the plaintiffs who have opted to

exclude themselves from the settlement have perhaps unintentionally benefited the

remaining class members.  Those who opted out were set to receive approximately

$160,207.21 of the fund, all of which will now go to the class, and enhance each

claimants' award by an average of $900.  (Doc. 123, p. 20).

In exchange for the settlement, all class members release the Defendants

from all claims arising through the "Final Approval Date."  The ability to reassert a

class action claim in state or federal court is waived.  (Doc. 123, p. 21).

"Before approving the settlement of a class action, a district court must

certify that the settlement comports with Rule 23 and is 'fair, reasonable and

adequate.'"  *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)

(quoting FED. R. CIV. P. 23(e)).  The Third Circuit has advised that

> where settlement negotiations precede class certification, and approval for
> settlement and certification are sought simultaneously, we require district
> courts to be even "more scrupulous than usual" when examining the fairness
> of the proposed settlement.  This heightened standard is intended to ensure
> that class counsel has engaged in sustained advocacy throughout the course

---

[5]  Specifically, each class members' initial payment amount will be calculated from the $2,070,000 remainder of the fund (referred to in the Agreement as the "net settlement amount") by multiplying the net settlement amount by the number of individual class member's workweeks during the payment period and then dividing that amount by the total combined work weeks of all class members.  (*See* Doc. 120-1, p. 3).  Each class member's second payment amount shall be calculated by subtracting the initial payment amount from the net settlement amount, and multiplying that number by the individual claimant's work weeks during the payment period, again divided by all claimants' total combined workweeks.  (*See* Doc. 120-1, p. 4).

of the proceedings, particularly in settlement negotiations, and has protected the interests of all class members.

*In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 534 (3d Cir. 2004) (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 317 (3d Cir. 1998).  In order to assist in this examination, the Third Circuit has developed a nine factor test.  Known as the Girsh Factors, the nine factors a court must consider when determining the fairness of a settlement include:

1. The complexity, expense, and likely duration of the litigation;
2. The reaction of the class to the settlement;
3. The stage of the proceedings and the amount of discovery completed;
4. The risks of establishing liability;
5. The risks of establishing damages;
6. The risks of maintaining the class action through trial;
7. The ability of the defendants to withstand a greater judgment;
8. The range of reasonableness of the settlement fund in light of the best possible recovery; and
9. The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 158 (3d Cir. 1975).  Plaintiff's brief indicates that the parties have agreed that all nine factors weight in favor of a finding that the settlement is fair.  As noted above, there are no objectors to the settlement terms or amount.  However, in "[a]cting as a fiduciary responsible for protecting the rights of absent class members, the Court is required to 'independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished.'"

*Hegab v. Family Dollar Stores, Inc.*, Civ. A. No. 11-1206(CC), 2015 WL 1021130,

at *5 (D.N.J., Mar. 9, 2015) (quoting *In re Cendant Corp. Litig.,* 264 F.3d 201, 231

(3d Cir. 2001).  Our own review, laid out below, indicates that the settlement

award is fair, and thus we shall approve it.

### i.    The complexity, expense, and likely duration of the litigation

"The first factor captures the probable costs, in both time and money, of

continued litigation."  *Warfarin*, 391 F.3d at 535-36 (internal citations and

quotations omitted).  As this case has continued on for over three years, the parties

have already contributed significant resources in both time and money thus far.  If

this case were to proceed to trial, both parties would incur even greater attorneys'

fees and litigation expenses.  Plaintiffs' counsel has emphasized that "this lawsuit

would require the Court to resolve complex and hotly-contested legal issues

pertaining to preemption, merits issues, damages, and the propriety of Rule 23

class certification," involving expert testimony, and competing motions regarding

the permissible use of "representative" trial testimony.  (Doc. 123, p. 30).

Furthermore, Defendants have already expressed their intent to appeal the Court's

summary judgment ruling, in which we held that Massachusetts law, and not

Pennsylvania law, applies to the proceedings.  All of this would absorb additional

time and resources of the parties.  As a result of these concerns, this first factor

weighs strongly in favor of approval of the settlement, which would provide

immediate and significant benefits to the settlement class.  *See Hegab*, 2015 WL

1021130, at *5 (noting that where a settlement provides "immediate and substantial benefits for the settlement class," and continued litigation would be lengthy and expensive, the first *Girsh* factor weighs in favor of settlement).

### ii.   The reaction of the class to the settlement

The second Girsh factor "attempts to gauge whether members of the class support the settlement." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998) (citing *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n. 15 (3d Cir. 1993)). As noted, there has not been a single objection to the settlement. Though seven members have opted to exclude themselves from the settlement (representing 3.1% of the settlement class), Plaintiffs' counsel has represented that they have not done so because they were displeased with the settlement terms as pertaining to the class members, but because they feel that particular circumstances of their claims entitle them to significantly greater relief. (*See* Transcript, Doc. 129, p. 7; Doc. 123, p. 19). The excluded members intend to litigate their claims independently, as they are entitled to do. We do not find that their decision in any way negatively reflects on the settlement terms. Further, the relatively small percentage of class members that have elected to opt out of the settlement does not present a barrier to our approval. *See Warfarin*, 391 F.3d at 536 (upholding a district court decision to approve settlement where a small number of class members objected to or opted to exclude themselves from the

settlement); *In re Nat'l Football League Players Concussion Injury Litig.*, --- F.3d ----, 2016 WL 1552205, at *16 (3d Cir. April 18, 2016) (ruling in favor of class action certification and settlement for over 20,000 class members where approximately 1.4% of class members either opted out or objected to the settlement terms).  Thus, this second factor also weighs in favor of approval of the settlement.

### iii.   The stage of the proceedings and the amount of discovery completed

In order for a settlement to be considered fair, the parties must demonstrate '"an adequate appreciation of the merits of the case before negotiating.'  *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995)).  To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken." *In re Prudential*, 148 F.3d at 319.  Here, the parties submit that they have engaged in extensive discovery in the two years leading up to the settlement.  (Doc. 123, p. 31).  Further, they conducted two separate and thorough mediation sessions with an experienced mediator before reaching a settlement.  (*Id.*).  This information, as well as a detailed legal analysis of the risks of further litigation for both parties, led both to the conclusion that negotiations were prudent.  (*Id.*).  As such, we see no reason to suspect that the parties lacked adequate understanding of the merits of their respective positions

before entering into negotiations.  We thus find that this factor also points in favor of approval of the settlement.

### iv.    The risks of establishing liability and damages

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319.  "However, in doing so, a court need not conduct a 'mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel.'" *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 238 (D.N.J. 2005) (citing *In re Ikon Office Solutions, Inc. Sec. Litig.*, 166, 181 (E.D. Pa. 2000)).  Here, as in the first *Girsh* factor, Plaintiffs' counsel have assured the Court that they are aware of several important risks they face before they can establish liability.  Again, they point to the appeal that Defendants would likely take regarding this Court's decision to apply Massachusetts law.  Further, Plaintiffs emphasize the possibility that, if they win on appeal, this Court could still find the Massachusetts Wage Act to be preempted.  Even if the Act were not preempted, Plaintiffs would still need to qualify as employees under the definition provided by that Act.

Further, Plaintiffs note that Defendants vigorously dispute whether the damages Plaintiffs seek are of the type recoverable under the Act.  Plaintiffs'

counsel currently estimates that Plaintiffs have incurred a total of $6,902,346 in

charges and expenses, $4,232,192 of which are due to "route loan repayments."

This distinction is important because the route loan repayments go towards the

ownership of a distinct delivery route, which can be sold by Plaintiffs in the open

marketplace should they no longer wish to perform services under the Distributor

Agreements.  (Doc. 123, p. 11).  Thus, the payments Plaintiffs made to Defendants

have arguably caused Plaintiffs to build equity and receive value, in that the routes

represent an asset.  Defendants plan to argue that as such, Plaintiffs are not entitled

to receive damages in exchange for these payments, as they are not of the type

protected by the Wage Act.  (*Id*.).  If these arguments are meritorious, it goes

without saying that they could translate into an outcome where the Plaintiffs would

be entitled to receive substantially less than they feel they are owed, or nothing at

all.  In weighing the risks of these potential outcomes against the immediate and

definite settlement the class would enjoy, it is clear that this factor too weighs in

favor of the Court's approval of the proposed settlement.

#### v.     The risks of maintaining the class action through trial

'"Because the prospects for obtaining certification have a great impact on

the range of recovery one can expect to reap from the [class] action, this factor

measures the likelihood of obtaining and keeping a class certification if the action

were to proceed to trial."'  *Hegab*, 2015 WL 1021130, at *8 (quoting *Warfarin*,

391 F.3d at 537).  "Under Rule 23, a district court may decertify or modify a class

at any time during the litigation if it proves to be unmanageable."  *In re Prudential*,

148 F.3d at 321.  However, "[i]n a settlement class, this factor becomes essentially

'toothless' because 'a district court need not inquire whether the case, if tried,

would present intractable management problems . . . for the proposal is that there

be no trial.'"  *In re Nat'l Football League*, 2016 WL 1552205, at *25 (quoting *In

re Prudential*, 148 F.3d at 321).  Thus, this factor weighs only slightly in favor of

settlement approval and is deserving of minimal consideration.  *Id*. (noting that the

lower court correctly determined that "the likelihood of obtaining and keeping a

class certification if the action were to proceed to trial . . . deserved only minimal

consideration.").

### vi.    The ability of Defendants to withstand greater judgment

This *Girsh* factor considers "whether the defendants could withstand a

judgment for an amount significantly greater than the [s]ettlement."  *In re

Warfarin*, 391 F.3d at 537-38 (internal quotations and citations omitted).  This

factor "is most relevant when the defendant's professed inability to pay is used to

justify the amount of the settlement."  *In re Nat'l Football League*, 2016 WL

1552205, at *25-26.  Where a defendant does not claim the potential for financial

instability as a justification for the size of the settlement, courts have found this

factor to be neutral.  *Id*.; *see also Haught v. Summit Resources*, 1:15-cv-0069, 2016

WL 1301011, at *17-18 (M.D.Pa April 4, 2016).  Here, Defendants have not

asserted an inability to pay any more than the settlement amount.  Thus, we find

here too that this factor weighs neither for nor against approval of the proposed

settlement.

> ### vii.  The range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation

> The last two *Girsh* factors ask whether the settlement is reasonable in light
> of the best possible recovery and the risks the parties would face if the case
> went to trial.  In order to assess the reasonableness of a proposed settlement
> seeking monetary relief, "the present value of the damages plaintiffs would
> likely recover if successful, appropriately discounted for the risk of not
> prevailing, should be compared with the amount of the proposed settlement.

*In re Prudential*, 148 F.3d at 322 (quoting *G.M. Trucks,* 55 F.3d at 806)).  As the

lower court noted in *In re Prudential*, to calculate the best possible settlement for

Plaintiffs would be "exceedingly speculative," particularly given the significant

risks of litigation presented here and Defendant's propositions regarding the

attenuation of Plaintiffs' claims.  *Id*.  Plaintiffs' counsel emphasizes that the

settlement procures 30% of the total alleged losses for Plaintiffs, and 77% of the

alleged losses "not attributable to the especially vulnerable Route Loan

Repayments."  (Doc. 123, p. 38).  We are thus persuaded that the settlement is

reasonable in light of the best possible recovery for Plaintiffs, and conclude that

the final two *Girsh* factors weigh in favor of settlement approval.

This concludes our analysis of the nine *Girsh* factors. Seven of the nine factors weigh strongly in favor of approving the proposed settlement, while the fifth and sixth factors (the risks of maintaining the class action through trial, and the ability of the Defendants to withstand a greater judgment) are either not as strongly persuasive in favor of approval, or neutral.  As such, we find that the majority of the factors weigh in favor of approval of the proposed settlement, and that our approval is therefore warranted.

### C.     Enhancement Awards

The parties' proposed settlement agreement provides for a $15,000 enhancement award for each of the two the class representatives who have not opted to exclude themselves from the class: Mssrs. Mosso and Delgado.  (Doc. 123, p. 39).  Thus, $30,000 in total is to be detracted from the settlement fund in order to procure these enhancement awards.  "Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Hegab v. Family Dollar Stores, Inc.*, 2015 WL 1021130, at *16 (internal quotations and citations omitted) (approving an enhancement award of $7,500 to the named plaintiff). "'An incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected.'" *Varacallo*, 226 F.R.D. at

257 (quoting *In re Cendant Corp. Derivative Action Litig.*, 232 F.Supp.2d 327, 344 (D.N.J. 2002)).  However, where an enhancement award would be paid solely from the settlement fund, thereby depleting the financial resources of the class members, a court "carefully reviews this request to ensure its fairness to the class." *Id*.  Such is the case here.

A thorough history exists on the approval of reasonable enhancement awards.  In *Varacallo*, the District Court for the District of New Jersey amply detailed this history, wherein courts approved enhancement awards ranging from $1,000 to $50,000.  *Id*. at *257-58 (approving $10,000 enhancement awards for five named plaintiffs, and $3,000 and $1,000 awards for two others).  However, "incentive awards will not be freely distributed without a substantial basis to demonstrate that the individual provided services for the Class and incurred risks during the course of the litigation." *Id*. at 258.

Here, parties explain that the two named Plaintiffs have been "reliable and diligent" in their assistance to counsel throughout the class action.  (Doc. 123, p. 39).  Furthermore, at the fairness hearing, counsel for Plaintiffs explained that, in his experience, there is often great hesitation on the part of plaintiffs to come forward in these types of class actions, as they fear negative repercussions in the employment market.  (Transcript, Doc. 129, p. 4).  In this age of information technology, future employers can quickly become aware of a plaintiff's

involvement in employment rights litigation.  Rightly or wrongly, plaintiffs, and

particularly delivery drivers, often fear they will not find work after the litigation is

resolved, due to their involvement.  (*Id*. at pp. 4-5).  Thus, the requested

enhancement awards serve not only to compensate Mssrs. Mosso and Delgado for

their participation, but also to reward them for their bravery in bringing this

litigation forward, as it has resulted in beneficial effects for a large class of drivers.

The rewards further incentivize other drivers to participate in other meritorious

litigation in the future.  Finally, we note that the proposed enhancement awards do

not fall outside of those awards previously approved by courts in similar cases,

though they may perhaps be on the higher range of the spectrum of approved

awards.  *See Varacallo*, 226 F.R.D. at 257-58.  Given the foregoing analysis, the

Court finds that Plaintiffs are entitled to their requests.

### D.    Attorneys' Fees

"A thorough judicial review of fee applications is required in all class action

settlements."  *In re General Motors Corp*., 55 F.3d 768, 819 (3d Cir. 1995).  Rule

23(h) provides that "[i]n a certified class action, the court may award reasonable

attorney's fees and nontaxable costs that are authorized by law or by the parties'

agreement."  FED. R. CIV. P. 23(h).  "The awarding of fees is within the discretion

of the Court, so long as the Court employs the proper legal standards, follows the

proper procedures, and makes findings of fact that are not clearly erroneous."

*Hegab*, 2015 WL 1021130, at *10 (citing *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 727 (3d Cir. 2001)).  In the instant case, Defendants agree to pay attorneys' fees in the amount of $750,000, which includes settlement administration expenses and litigation costs in the amount of $15,745.  (Doc. 123, p. 39-40).  Thus, the total payment to Plaintiffs' attorneys in exchange for their services amounts to $734,255.  (*Id.*).

"Relevant law evidences two basic methods for evaluating the reasonableness of a particular attorneys' fee request—the lodestar approach and the percentage-of-recovery approach."  *Hegab*, 2015 WL 1021130, at *11 (internal quotation marks and citation omitted).  "The lodestar method is generally applied in statutory fee shifting cases and 'is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation.'"  *Id.* (citing *In re Cendant Corp.*, 243 F.3d at 732).  The lodestar is also preferable where "the nature of the settlement evades the precise evaluation needed for the percentage of recovery method."  *In re Gen. Motors*, 55 F.3d at 821; *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005).  However, "[t]he percentage-of-recovery method is preferred in common fund cases, as courts have determined 'that Class Members would be unjustly enriched if they did not adequately compensate counsel responsible for generating the

fund.'" *Hegab*, 2015 WL 1021130, at *11 (quoting *Varacallo,* 226 F.R.D. at 249 (internal quotation marks and citation omitted)).  The Court has discretion to decide which method to employ.

The parties submit, and we concur, that in the instant case the percentage-of-recovery method is preferable to evaluate the reasonableness of the attorneys' fee request.  Here, there is a clearly delineated common fund which lends itself well to valuation.  Further, the fund is also not so small that a percentage-of-recovery method would not be sufficient to compensate Plaintiffs' attorneys.  Also, the percentage-of-recovery method has functioned here to incentivize counsel to obtain the maximum possible recovery in the shortest time possible given the circumstances, as it is meant to do.  *See Varacallo,* 226 F.R.D. at 249.  Thus, we shall proceed under the percentage-of-recovery method.

There are ten factors that the Third Circuit has identified in considering whether an attorneys' fee award is reasonable under the percentage-of-recovery method.  Known as the *Gunter/Prudential* factors, these are:

1.   The size of the fund and the number of persons benefited;
2.   Whether members of the class have raised substantial objections to the settlement terms or fee proposal;
3.   The skill and efficiency of the attorneys involved;
4.   The complexity and duration of the litigation;
5.   The risk of nonpayment;
6.   The amount of time devoted to the case by Plaintiffs' counsel;
7.   The fee awards in similar cases;

    8.    The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations;

    9.    The percentage fee that would be been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained;

    10.   Any innovative terms of settlement.

*In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009). "Trial courts must 'engage in a robust assessment of the [*Gunter/Prudential*] factors when evaluating a fee request.'" *Id*. (quoting *In re Rite Aid*, 396 F.3d at 302). "'Determining an appropriate award, however, is not an exact science.'" *Varacallo*, 226 F.R.D. at *248 (internal citation omitted). With this guidance in mind, we consider each factor in turn.

### i.    The size of the fund and number of persons benefited

"In considering the size of the expected recovery under the proposed settlement, . . . percentage awards generally decrease as the amount of the recovery increases. . . . The basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *In re Prudential*, 148 F.3d at 339 (quoting *In re First Fidelity Bancorporation Secs. Litig.,* 750 F.Supp. 160, 164 n. 1 (D.N.J.1990)). In *Erie Cnty. Retirees Ass'n v. Cnty. of Erie*, 192 F.Supp.2d 369, 381 (W.D.Pa. 2002), the court noted that in class action settlements worth millions of dollars, the attorneys' fees are often limited to 25% of the settlement

value "in order to prevent a windfall to counsel." *Id*.  In cases where the recovery exceeds $100 million, courts have found that further decrease in the percentage of guaranteed attorneys' fees may be warranted.  *Id*. at 331 (noting that the district court "found a range of 4.1% to 17.92% in cases where the recovery exceeded $100 million.").

As already noted, the class size here is 224, with 178 claims filed, and the size of the fund is $2,850,000.00, from which attorneys' fees, litigation costs and enhancement awards are to be subtracted.  By Plaintiffs' calculation, this fund results in an average individual payout of $11,692 and a median payout of roughly $10,444.  (Doc. 123, p. 41).  Thus, the number of individuals who must be compensated from the fund are not so numerous that their recovery will not be significant, and the size of the fund is well within the range that previous case law has found amenable to a 25% attorneys' fee award.  Here, the total amount of attorneys' fees amounts to 25.76% of the fund, thereby avoiding a windfall.  We thus find that the percentage of the fund is facially reasonable and counsels in favor of approving the proposed attorneys' fees request.

### ii.   Whether members of the class have raised substantial objections to the settlement terms or fee proposal

As already discussed in our consideration of the *Girsh* factors, the members of the class have not raised a single objection to any portion of the settlement agreement, including the settlement terms or the fee proposal.  Though not overly

significant, this absence nonetheless causes this factor to weigh in favor of

approval of the requested attorneys' fees.  *See Erie Cnty.*, 192 F.Supp.2d at 379

("Given the complexity of the analysis with respect to the attorneys' fees request,

we will afford some, albeit not significant, weight to the lack of objections.").

### iii.     The skill and efficiency of the attorneys involved

As noted above, class counsel are skilled and experienced litigators who

have handled complex employment rights class actions numerous times before.

Thus, this factor also weighs in favor of approving the requested attorneys' fees.

*See Hegab*, 2015 WL 1021130, at *12 ("[C]lass counsel are experienced in

litigating and settling consumer class actions.  Class counsel obtained substantial

benefits for the class members— . . . a consideration that further evidences class

counsels' competence.  Thus, this factor also weighs in favor of approval of the fee

award."); *Haught v. Summit Resources*, 1:15-cv-0069, 2016 WL 1301011, at *9

(same).

### iv.     The complexity and duration of the litigation

This factor is identical to the first *Girsh* factor.  As noted there, this case has

stretched on for over three years.  Despite this timeline, it is clear that many

unresolved and hotly contested issues remain.  As noted in our consideration of the

*Girsh* factors, Defendants have already expressed their intent to file an appeal of at

least one matter in this case, and both parties have indicated the strength of their

arguments and their willingness to diligently pursue each matter.  This, combined

with the uncertainty and complexity of many of the legal issues presented, *see*

*Schwann v. FedEx Ground Package System, Inc*., Civ. Action No. 11-11094-RGS,

2014 WL 496882, at *3 (D. Mass. Feb. 7, 2014) ("[T]he question of whether

business expenses and deductions borne by employees are recoverable under the

Wage Act us unsettled under state law. . . ."), indicates that this factor also weighs

in favor of approval of the attorneys' fees.

###### v.      The risk of nonpayment

Here, the parties note that Plaintiffs' counsel always works on a contingency

fee basis.  (Doc. 123, p. 41).  Thus, the risks inherent in litigation extend to the

uncertainty surrounding whether counsel will receive payment and, as continually

noted, the Plaintiffs have indicated that though they believe a favorable outcome is

merited, it is by no means a certainty.  Indeed, courts have noted that where

plaintiffs' counsel faces a risk of nonpayment or lesser payment should the case

proceed to the trial phase, that risk should be considered when assessing attorneys'

fee awards.  *See Gunter v. Ridgewood Energy Corp*., 223 F.3d 190, 199 (3d Cir.

2000) ("[T]he risk that counsel takes in prosecuting a client's case should also be

considered when assessing a fee award."); *In re Lucent Technologies, Inc.,*

*Securities Litig*., 327 F.Supp.2d 426, 438 (D.N.J. 2004) ("[T]he intrinsically

speculative nature of this contingent fee case enhances the risk of non-payment and

bolsters the Court's analysis"). As such, this factor weighs in favor of approving the proposed attorneys' fees.

### vi.   The amount of time devoted to the case by Plaintiffs' counsel

Plaintiffs' counsel submits that they have spent 776 attorney hours working on the instant case. (Doc. 123, p. 42; *see* Doc. 122-4; Doc. 122-5). The amount of time Plaintiffs' counsel devoted to the case is thus in line with that which other courts have found to favor approval of proposed fee awards. *See Hegab*, 2015 WL 1021130, at *13 (finding that over 1,000 hours of contingent work over the course of three years weighed in favor of approval). We arrive at the same conclusion and find that this factor too supports approval of the fee award.

### vii.   The fee awards in similar cases

"There is no consensus on what percentage of a common fund is reasonable, although several courts in this circuit have observed that percentage of recovery fee awards generally range from 19% to 45%, with 25% being typical." *Erie Cnty.*, 192 F.Supp.2d at 378 (approving a fee award of 38% of the total fund); *see In re Lucent*, 327 F.Supp.2d at 438 ("While percentages awarded have varied considerably, most awards range 'from nineteen percent to forty-five percent of the settlement fund'" ) (quoting *In re Cendant Corp.*, 243 F.3d at 736). Here, the parties have proposed an attorneys' fee award that constitutes approximately 25%

of the total fund.  This is in line with the percentage that has been considered

typical in the past, and thus this factor too weighs in favor of approval.

### viii.   The value of benefits attributable to the efforts of class counsel, relative to the efforts of other groups

This factor seeks to compare the actions of government prosecutions and

agency litigation to the instant private litigation.  *See In re Diet Drugs*, 582 F.3d

524, 544 (3d Cir. 2009) (discussing "the typical antitrust or securities litigation – in

which the Gunter/Prudential factors are often considered – where government

prosecutions frequently lay the groundwork for private litigation.").  Specifically,

the Third Circuit has explained that comparing a case to other similar cases can

give plaintiffs' counsel a "litigation roadmap" such that their work is less arduous.

*Id.*  In *In re Diet Drugs*, this factor was specifically addressed in the context of

another case being litigated in Texas against the same defendant, Wyeth, which

preceded that of the Third Circuit plaintiffs.  *Id.* (noting the "contributions of

lawyers who, while conducting contemporaneous diet drugs litigation in Texas

state courts, obtained millions of pages of discovery from Wyeth and took 43

depositions before a single deposition took place in the MDL.").  Here, however,

Plaintiffs' counsel has clarified that there is no such preceding case against

Defendants, and no comparable government or agency litigation exists to provide

guidance or comparison to the work of counsel.  (Transcript, Doc. 129, p. 8).

Thus, we find that this factor neither weighs for nor against approval of the requested fee award.

### ix.     The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement

This analysis requires the Court to evaluate "whether the requested fee is consistent with a privately negotiated contingent fee in the marketplace. 'The percentage-of-the-fund method of awarding attorneys' fees in class actions should approximate the fee [that] would be negotiated if the lawyer were offering his or her services in the private marketplace.'" *Hegab*, 2015 WL 1021130, at *14 (quoting *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013, *44-45, 2005 WL 1362974).  At the fairness hearing, Plaintiffs' counsel noted that counsel would typically charge a 33% contingency fee, as is customary in standard industry practice.  (Transcript, Doc. 129, p. 8).  As 33% is obviously a greater amount than the 25% attorney fee award Plaintiffs' counsel are now requesting, we find that this factor also points in favor of approval of the proposed fee.

### x.     Innovative terms of settlement

In certain cases, a district court may find that "class counsels' representation and the results achieved [by the settlement agreement] were 'nothing short of remarkable.'" *See In re Prudential*, 148 F.3d 283, 339.  Particularly where a settlement involved "innovative" or unique terms, such a finding may be

warranted.  *Id*. (describing the findings of the lower court regarding plaintiffs'

counsels' work on the settlement, including "the availability of full compensatory

relief, the extensive and comprehensive outreach, and the multi-tiered review

process designed to ensure fair scoring of claims," among other characteristics).

Here, Plaintiffs' counsel worked diligently to procure a monetary settlement for the

class, but also to establish a "cost-effective dispute resolution provision" for those

currently employed with S-L.  (Doc. 123, p. 21).  Specifically, it became apparent

to counsel that most of their clients live and work in Massachusetts, but their

Distributor Agreements contain a choice of forum clause that restricts any dispute

to resolution by the Pennsylvania courts, without any provision for mediation or

arbitration at all.  (*Id*.).  Because Plaintiffs' disputes tend to be based in contract-

law, they are well-suited to arbitration.  (*Id*., p. 22).  They are also generally

comprised of relatively "low-value" claims and ill-suited to formal litigation, (*id*.),

which this Court recognizes can be preclusively expensive for some parties,

particularly when they must travel long distances and take time off from work to

reach the chosen forum.  Thus, the Plaintiffs still currently working with

Defendants lacked an efficient and accessible dispute resolution mechanism.  (*Id*.);

(Transcript, Doc. 129, p. 10).

To remedy this shortfall, Plaintiffs' counsel negotiated for the inclusion of a

provision within the Settlement Agreement, providing "that any future claims

brought by a [driver] be submitted to informal resolution and if the claim is not resolved, then to arbitration, and that the ability to assert a class action claim in state or federal court is waived." (Doc. 123, p. 21).  The arbitration is to be conducted in a location near the individual driver's territory, rather than in Pennsylvania.  (*Id.*, p. 21-22).  Further, Defendants agree to pay all arbitration costs beyond a $200 filing fee.  (*Id.*, p. 22).  Finally, acceptance of the arbitration provision is not mandatory for Plaintiffs who still wish to retain the terms of dispute resolution set by the original Distributor Agreements.  Rather, Plaintiffs are still free to collect their settlement payment even if they choose not to adopt the alternative dispute resolution provision.  (*Id.*, p. 23).  To date, three Plaintiffs have chosen to opt out of the provision.  (Transcript, Doc. 129, p. 11).

The procurement of this provision is a clear example of an innovative settlement term that provides Plaintiffs with a right they did not have prior to the settlement.  Beyond monetary value, the arbitration provision provides current delivery drivers with a quick and cost-effective means of addressing any grievance or disagreement that may arise between themselves and Defendants, without resorting to the courts.  As no employment relationship is perfect, we have no doubt that such disagreements will indeed arise again, and Plaintiffs' counsel has done them a great service by identifying and remedying this need while all parties

were at the bargaining table.  As such, we find that this factor weighs in favor of approving the proposed attorneys' fee agreement.

Thus concludes our analysis of the ten fee award reasonableness factors. "The fee award reasonableness factors 'need not be applied in a formulaic way' because each case is different, 'and in certain cases, one factor may outweigh the rest.'"  *In re Diet Drugs*, 582 F.3d at 545 (quoting *In re AT & T Corp.,* 455 F.3d 160, 166 (3d Cir. 2006)).  Here, we determine that the vast majority of the factors weigh in favor of approving the proposed fee award, and that any remaining factors are neutral, and thus do not weigh against such approval.  Therefore, we hold that the requested fee award is fair and reasonable under the percentage-of-recovery method.  We turn now to the lodestar cross check.

### xi.    Lodestar Analysis

"[I]t is sensible for a court to use a second method of fee approval to cross check its conclusion under the first method. . . ."  In re General Motors, 55 F.3d 768, 820-21 (3d Cir. 1995).  Thus, we turn to the lodestar method to ensure that our initial analysis under the percentage-of-recovery method was not inaccurate. In its own cross check, the district court in *Hegab* provided a detailed explanation of the lodestar calculation that we referenced in our analysis in *Haught*, 2016 WL 1301011, at *11-12.  Because of its clarity, we excerpt from that opinion again here.

The lodestar analysis is performed by "multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *In re Rite Aid,* 396 F.3d at 305: *see also In re Diet Drugs Prod. Liab. Litig.,* 582 F.3d 524, 540 (3d Cir.2009).  When performing this analysis, the Court "should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *In re Rite Aid.* 396 F.3d at 306.  The lodestar figure is presumptively reasonable when it is calculated using a reasonable hourly rate and a reasonable number of hours. *Planned Parenthood of Cent. N.J. v. Att'y Gen. of N.J.,* 297 F.3d 253, 265 n. 5 (3d Cir.2002) (citations omitted). After calculating the lodestar amount, the Court may increase or decrease the amount using the lodestar multiplier.  The multiplier is calculated by dividing the requested fee by the lodestar figure.  "The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *In re Rite Aid.* 396 F.3d at 305–06

*Hegab*, 2015 WL 1021130, at *14-15.

We begin by calculating the lodestar figure.  The affidavits of Plaintiffs' counsel indicate that they have worked a total of 781.1 hours on the matter since its inception in February 2013.[6][7]  (Doc. 122-4; Doc. 122-5).  Counsels' hourly rates include $400-600/hour for senior attorneys, $275 per hour for a junior attorney, and $100 per hour for a paralegal.  (*Id*.).  While the Plaintiffs' brief does not provide the "blended" rate that the attorneys used to calculate their overall lodestar amount of $320,662, when this amount is divided by the hours worked, the rate

---

[6] It appears that there was a typographical error in the submission by Winebrake & Santillo, LLC, and that 442.1 hours (and not 4421 hours) is the correct figure for the hours worked, based on the provided hourly break-down chart.  (Doc. 122-4, ¶ 21).  This, added to the 339 hours submitted by Lichten & Liss-Riordan, P.C., sums for a total of 781.1 hours.

[7] As indicated above, our analysis of comparative case law has already shown this is a reasonable amount of time as compared to time spent on cases of a similar nature and the complexity of the matters involved.

used appears to be approximately $410.52 per hour, which is reasonable given all of the rates normally charged and the rates typical for this geographic region given the experience of the attorneys involved.  Thus, we conclude that the lodestar figure of $320,662 is presumptively reasonable.

We next calculate the multiplier.  The requested attorneys' fee is $734,255, which, when divided by the lodestar amount, provides lodestar multiplier of 2.29. Accepted multipliers are those up to and including "slightly above 3."  *Keller v. TD Bank, N.A.*, 2014 WL 5591033, at *16 (E.D.Pa. Nov. 4, 2014).  A lodestar multiplier of 2.75 was recently approved in *In re Staples Inc. Wage & Hour Employment Practices Litig.*, 2011 WL 5413221, at *5 (D.N.J. Nov. 4, 2011). However, courts have declined to implement multipliers of 5.1 and 4.07 as these have been found too high.  *In re Prudential*, 148 F.3d at 340-41; *In re Rite Aid*, 396 F.3d at 306.

Given the risks inherent in contingent work generally, the high quality of the attorneys' work in this case, and the comparative reasonableness of the lodestar multiplier requested here, the Court sees no reason to determine that a multiplier of 2.29 is too high.  Further, in light of the somewhat more relaxed standard that the Court need apply in regard to the lodestar analysis as a cross-check,[8] there appears

---

[8] "[W]e reiterate that the percentage of common fund approach is the proper method of awarding attorneys' fees. The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts  may rely on summaries submitted by the attorneys and need not review actual billing records. *See Prudential,* 148 F.3d at 342 (finding no abuse of

no indication that our initial percentage-of-recovery analysis was erroneous.  Thus, in reliance on the percentage-of-recovery method conducted above, and the lodestar cross check, this Court concludes that the requested attorneys' fee is fair and adequate.

### E.    Litigation Fees

In total, Plaintiffs' counsel requests $15,745 in litigation fees and expenses. The firm of Winebrake & Santillo, LLC, has submitted an itemized list detailing $6,745 in costs, including a mediation fee of $5,231.07 and various photocopying and travel expenses.  (Doc. 122-4, ¶ 22).  Lichten & Liss-Riordan, P.C. has also submitted a detailed listing of expenses, including travel and service administrative costs totaling $6,174.80.  (Doc. 128).  This supplied documentation does not include costs of mailing, copying and administration fees that the firm estimates at $3,500.00, or travel costs for Attorney Lichten's travel to the fairness hearing of April 20, 2016.  (*Id*.).  "Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action."  *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1224-25 (3d Cir. 1995).  We find that counsel's expenses were adequately documented and were reasonably and appropriately incurred through the course of

---

discretion where district court "reli[ed] on time summaries, rather than detailed time records"). Furthermore, the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award.  Lodestar multipliers are relevant to the abuse of discretion analysis. But the lodestar cross-check does not trump the primary reliance on the percentage of common fund method."  *In Re Rite Aid*, 396 F.3d at 305-06.

litigation in this case.  Thus, we approve the requested litigation fees in the amount of $15,745.

### F.   Notice

Finally, we briefly consider the notice requirement.  Rule 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."  FED. R. CIV. PRO. 23(e).  As noted above, the Court reviewed and approved the parties' proposed notice and claim forms on December 28, 2015, as part of the Order granting the parties' Motion for Preliminary Approval of the Class Action Settlement and Certification of the Settlement Class.  (Doc. 121).  In Plaintiffs' Brief, Plaintiffs represent that each Plaintiff was mailed an individualized notice form describing the lawsuit, the total settlement value, the attorneys' anticipated payments, and also the class enhancement awards.  (Doc. 123, p. 15).  The notice form also provided each Plaintiff with his or her estimated payout amount (presuming that all of the settlement class members returned claim forms).  (*Id*.).  As noted above, Plaintiffs' counsel also submits that once the initial settlement payments are distributed, class members who did not respond to the initial notice and claim forms will have a second opportunity to file a claim.  Given these efforts, the Court has no reason to conclude that notice was not adequately provided to the class.

## III.   CONCLUSION

"The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation. . . .   These economic gains multiply when settlement also avoids the costs of litigating class status—often a complex litigation within itself."   *In re Gen. Motors*, 55 F.3d 768, 784 (3d Cir. 1995).   In light of the foregoing analysis, the Court shall certify the proposed class and approve the Settlement Agreement in its entirety.   A separate order shall issue.